**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                     No. CR 10-2072 JB

SALVADOR DE JESUS GUTIERREZ-CASTRO,

       Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on: (i) the Plaintiff's Amended Notice of Intention to Offer Expert Testimony, filed July 26, 2011 (Doc. 56); and (ii) Defendant Gutierrez-Castro's Response to Governments [sic] Notice of Intention to Offer the Expert Testimony of James McNutt, filed August 4, 2011 (Doc. 66). The Court held a hearing on August 4, 2011 and on August 11, 2011. The primary issue is whether Plaintiff United States of America can introduce the expert testimony of James McNutt, from the Border Patrol/Forensic Document Laboratory, who will testify about the methods and practices of inked fingerprint analysis, compare several examples of fingerprints obtained from Defendant Salvador De Jesus Gutierrez-Castro, and testify that all the fingerprints belong to the same person. The Court will allow McNutt to testify. The parties agreed to McNutt testifying without the Court's imprimatur on McNutt as an expert witness. The Court will not allow the United States to offer him as an expert witness in the jury's presence, the Court will not certify McNutt as an expert witness in the jury's presence, and the jury instructions will not refer to him as an expert. The issues that the United States and Gutierrez-Castro bring out during McNutt's direct examination and cross examination will go to the weight and credibility of McNutt's testimony.

## FACTUAL BACKGROUND

McNutt works at the Southwest Regional Science Center in Houston, Texas.  See Transcript of Hearing at 121:21-22 (taken August 11, 2011)(McNutt)("Aug. 11, 2011 Tr.").[1]  He has been a fingerprint specialist for approximately fifteen years.  See id. at 122:6-15 (Cairns, McNutt).  McNutt has completed two hundred hours of training with the Federal Bureau of Investigation in latent print classification processing and identification, he has taken an advanced administrative latent print course, and he has had twenty-four hours of training in advanced palm print identification.  See Aug. 11, 2011 Tr. at 122:25-123:8 (McNutt).  McNutt is a member of the International Association for Identification ("IAI").  Aug. 11, 2011 Tr. at 123:12-17 (Cairns, McNutt).  McNutt was first certified in 2001.  See Aug. 11, 2011 Tr. at 132:11-12 (Sapien, McNutt).  IAI requires re-certification every five years.  See Aug. 11, 2011 Tr. at 132:18-20 (Sapien, McNutt).  McNutt was certified in 2006 and was last certified in 2011.  See Aug. 11, 2011 Tr. at 132:21-133:1 (Sapien, McNutt).  To be re-certified, the IAI requires a person to accumulate eighty hours of continuing education credits.  See Aug. 11, 2011 Tr. at 133:4-6 (Sapien, McNutt).  The last course McNutt took was a forty-hour course on basic forensic ridgeology in 2004, but the IAI allows members to obtain hours by attending conferences, going to workshops, doing casework, or teaching.  See Aug. 11, 2011 Tr. at 133:9-134:10 (Sapien, McNutt).  McNutt has accumulated approximately one-hundred-and-twenty hours by attending conferences and workshops, doing casework, and teaching, but did not have space to list all these activities on his resume.  See Aug. 11, 2011 Tr. at 134:8-10 (McNutt).  McNutt testified that error rates for fingerprint analysis exist, but it is hard to determine an error rate; he testified, however, that the general consensus is that the error rate is very low.  See Aug. 11, 2011

---

[1] The Court's citations to the transcripts are to the Court Reporter's original, unedited versions.  Any final versions may contain different line and/or page numbers.

Tr. at 149:19-150:1 (Sapien, McNutt).  He stated that there have been approximately thirty documented misidentifications in the last thirty or forty years out of millions of fingerprints. See Aug. 11, 2011 Tr. at 150:3-10 (McNutt).  McNutt stated that ACE-V is the methodology fingerprint analysts use -- which is an analysis and comparison followed by verification.  See Aug. 11, 2011 Tr. at 125:20-23 (McNutt).  McNutt testified that a fingerprint analyst looks the levels of detail in the print, starting with the first level -- which is the basic pattern of the print, such as whether the print is an arch or whirl -- to determine whether the prints match.  See Aug. 11, 2011 Tr. 126:5-21 (McNutt).  If the patterns are consistent, then the analysis moves to the second level of detail -- which is what the ridges do, such as whether the ridge is divided in half.  See Aug. 11, 2011 Tr. at 126:23-127:15 (McNutt).  The analysis then looks for the third level of detail -- which is the shapes of the ridges.  See Aug. 11, 2011 Tr. at 127:16-22 (McNutt).  The analyst then moves to the comparison phase, in which he or she compares the prints to determine whether the prints have the same levels of detail.  See Aug. 11, 2011 Tr. at 128:1-14 (McNutt).  If there are indications that the ridges and other details in the fingerprints match, then the analyst moves to the evaluation phase, where he or she determines whether there is enough information in agreement between the two prints to support a conclusion that the prints came from the same person.  See Aug. 11, 2011 Tr. at 128:1-14 (McNutt).  McNutt testified that fingerprint analysis is used throughout the country to identify people.  See Aug. 11, 2011 Tr. at 154:23-155:1 (Cairns, McNutt).  He also testified that there have been over a hundred years of empirical validation to support fingerprint analysis, although it has not been scientifically established that fingerprints are unique to each individual. See Aug. 11, 2011 Tr. at 137:5-18 (Sapien, McNutt).

## PROCEDURAL BACKGROUND

On July 14, 2010, a federal grand jury returned an Indictment charging Gutierrez-Castro with

a violation of 8 U.S.C. § 1326(a) and (b) -- Reentry of a Removed Alien.  See Doc. 14.  A jury trial is set to commence in this matter on August 11, 2011.

On July 26, 2011, the United States filed its Amended Notice of Intention to Offer Expert Testimony.  See Doc. 56.  The United States represents that it intends to introduce the expert testimony of McNutt.  It states that McNutt will testify about the methods and practices of inked fingerprint analysis.  It states that his testimony will include expert opinions based on specialized knowledge regarding these matters, which is derived from his education, training, and professional experience in fingerprint analysis.  The United States also represents that it will ask McNutt to compare several examples of fingerprints.  It states that the comparisons will be from fingerprints obtained from Gutierrez-Castro after his arrest that resulted in the indictment and fingerprints that were recorded on documents relating to Gutierrez-Castro's prior deportation.  The United States represents that McNutt will testify that all of the fingerprints belong to the same person.

On August 4, 2011, Gutierrez-Castro filed Defendant Gutierrez-Castro's Response to Governments [sic] Notice of Intention to Offer the Expert Testimony of James McNutt.  See Doc. 66.  Gutierrez-Castro moves the Court to exclude McNutt's testimony.  Gutierrez-Castro argues that McNutt is not sufficiently qualified to express "expert" opinions about the methods and practices of inked fingerprint analysis.  He contends that, because there are not standardized methods of accreditation or the necessary training to reduce errors, and because McNutt has not taken a class since 2004, he is not qualified to offer expert testimony about fingerprint analysis.  Gutierrez-Castro also argues that McNutt's proposed testimony does not reflect specialized knowledge.  He argues that fingerprint analysis is an unreliable process that does not pass the Daubert[2] test.  Finally,

_____

[2] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)(holding that the Federal Rules of Evidence assign to trial judge the task of ensuring that an expert's testimony both

Gutierrez-Castro argues that McNutt's testimony is prejudicial and that the Court should not give the testimony additional credit by allowing McNutt to testify as an expert.

On August 4, 2011, the United States filed the Government's Response to Defendant's Objection to the Use of Fingerprint Evidence.  See Doc. 68.  The United States asks the Court to overrule Gutierrez-Castro's objection.  It argues that Gutierrez-Castro cites no legal authority for his argument and instead relies on a series of academic articles.  It argues that every published decision to address this issue has found fingerprint analysis admissible.

At the hearing on August 4, 2011, the Court stated that it was reluctant to perform its gatekeeping obligations without hearing on some of the issues, such as McNutt's qualifications, and without hearing Gutierrez-Castro's cross-examination.  See Transcript of Hearing at 45:5-10 (taken August 4, 2011)(Court)("I'm a little reluctant to perform my gate keeping obligations without perhaps hearing on some of these issues . . . .").  The Court thus stated that it was inclined to set up at time before trial to conduct a Daubert hearing.  The United States informed the Court that McNutt would not be available until Thursday morning, the day the trial was scheduled to begin.  The United States offered to make McNutt available to the Court as soon as he arrives.  See Aug 4, 2011 Tr. at 47:4-7 (Cairns)("Unfortunately because Mr. [McNutt] . . . won't be ar[riving] here until Thursday morning, so I can certainly make him available to the Court as soon as he ar[rives] . . . but because he has to be in another state on Wednesday he won't actually arrive until Thursday morning.").  The Court stated that it would conduct the Daubert hearing during a break in the trial.  Gutierrez-Castro did not oppose this proposal.  See Tr. at 47:18 (Sapien).

Before the trial started on August 11, 2011, Gutierrez-Castro stated that he did not think that

_____

rests on a reliable foundation and is relevant to the issue before the court).

McNutt can be excluded as a witness.  He represented that the issue was whether McNutt would be designated or certified as an expert.  Gutierrez-Castro suggested that the parties conduct their direct and cross examination, and then address whether or not he would be certified as an expert, so that the parties did not have to conduct two examinations, one in front of the Court, and one in front of the jury.  The Court stated:

> THE COURT:  Well, maybe this will solve your concerns.  What I could instruct the United States to do -- and this is not [atypical] for me . . . [.]  I don't do it in every case because it's not everybody's concern but just don't ask the Court to certify.

> MR. CAIRNS:  Right.

> THE COURT:  And all that will happen is that when we do the jury instructions for example we don't use the word expert and the Court not put its imprimatur on him as an expert, and so I'll not if they don't offer him we just know he's going to testify, we've just d[ecided] that . . . he will testify and everything will[ ] go to weight and credibility don't offer him up and I don't certif[y] him and I don't say anything.  And there's a jury instruction . . . The Tenth Circuit jury instruction doesn't use the phrase "expert," and so we could all just agree we're not going to use it at all.  And then if you'll look at number 7, jury instruction 7, you know a couple of things we could do here.  It doesn't mention expert[.]  [I]t just talks about opinion testimony which I think is a better of way of talking about these types of witnesses anyway and that's usually what I say.  When somebody says, Your Honor, I would like you to accept so-and-so as an expert I usually say well, will allow Mr. Miller . . . to offer opinion testimony.  That's all I say.  And we could not even do that.  We just go ahead right ahead into your opinions and then on this instruction we could eliminate it, we could they've got the first two sentences.  We could leave it, but those might be ways to address your concern.

> MR. SAPIEN:  Well and that was my preference would be that we just proceed with the testimony and not have any.

> THE COURT:  Interaction between the Court.

> MR. SAPIEN:  Right

> [THE COURT:] . . .  is that agreeable to you Mr. Cairns?

> [MR. CAIRNS:] yes, Your Honor it is it is.

> THE COURT:  So . . . just do a direct examination[,] no interaction with the Court[;]

-6-

you d[o]nt ask him to be accepted by the Court.  We'll just agree that Mr. Sapien['s] concerns . . . go to weight and . . . not to exclusion of him as an expert

[MR. CAIRNS:] that's [perfectly] acceptable.

Aug. 11, 2011 Tr. at 8:10-19 ((Court, Sapien, Cairns).  The parties agreed to eliminate the first two sentences in Instruction No. 7, and the Court stated that it would  eliminate those sentences.  Gutierrez-Castro represented that he believed these actions resolved the issues under <u>Daubert v. Merrell Down Pharmaceuticals, Inc.</u>

## <u>LAW REGARDING THE COURT'S ROLE UNDER *DAUBERT V. MERRELL DOW PHARMACEUTICALS, INC.*</u>

Since the Supreme Court of the United States decided <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide.  The Court now must not only decide whether the expert is qualified to testify, but, under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, whether the opinion testimony is the product of a reliable methodology.[3]  <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u> requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound.

1.    **<u>Rule 702.</u>**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the

---

[3] The Supreme Court in <u>Daubert v. Merrell Dow Pharmaceuticals</u> addressed in detail how courts should determine whether opinion testimony is the product of a reliable methodology, but did not discuss the issue of whether an expert is qualified to testify.

case.

Fed. R. Evid. 702.  Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  United States v. Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994).  The Federal Rule of Evidence uses a liberal definition of "expert."  Fed. R. Evid. 702 advisory committee's note ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g. physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values.").

An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004).  The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met.  See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).  Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications."  Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted).  The Court should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or

an abuse of discretion").

### 2.    The Standard in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., LP, No. CIV 03-1160 BB/LAM, 2005 WL 5988649 at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)).  The Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 594-95.  The court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence.  See Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649 at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).  The United States Court of Appeals for the Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp.:

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." [Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)] (quoting Daubert, 509 U.S. at 589 . . . .).  This obligation involves a two-part inquiry. Id. "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.' " Id. (quoting Daubert, 509 U.S. at 592 . . . .). In making this determination, the district court must decide "whether the reasoning

or methodology underlying the testimony is scientifically valid. . . ."  Id. (quoting Daubert, 509 U.S. at 592-93 . . . .).  Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand." Daubert, 509 U.S. at 597 . . . .

397 F.3d at 883-84 (footnote omitted).  "The second inquiry is related to the first.  Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case. . . .  The evidence must have a valid scientific connection to the disputed facts in the case."  Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court), and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 591)).  If the expert's proffered testimony fails on the first prong, the court does not reach the second prong.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 884.

In conducting its review under Daubert v. Merrell Dow Pharmaceuticals, Inc., the court must focus generally on "principles and methodologies, and not on the conclusions generated."  Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619  JB/DJS, 2006 WL 4060665 at *11 (D.N.M.)(Browning, J.)(citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 595).  "Despite this focus on methodology, 'an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665 at * 11 (internal quotation marks and bracket omitted).  The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 881.  As the Tenth Circuit noted in Hollander v. Sandoz Pharmaceuticals Corp., 289 F.3d 1193 (10th Cir. 2002):

Because the district court has discretion to consider a variety of factors in assessing reliability under <u>Daubert</u>, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the <u>Daubert</u> manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. . . . Thus, when coupled with this deferential standard of review, <u>Daubert</u>'s effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

289 F.3d at 1206.  As the United States Court of Appeals for the Ninth Circuit noted in <u>Claar v. Burlington Northern Railroad Co.</u>, 29 F.3d 499 (9th Cir. 1994):

Coming to a firm conclusion first and then doing research to support it is the antithesis of this method.  Certainly, scientists may form initial tentative hypotheses. However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-503.

Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact.  In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

<u>Ram v. N.M. Dep't of Env't</u>, No. CIV 05-1083 JB/WPL, 2006 WL 4079623 at * 10 (citing <u>United States v. Rodriguez-Felix</u>, 450 F.3d 1117, 1123 (10th Cir. 2006)).

A defendant is entitled, under some circumstances, to request a written summary of expert testimony the United States intends to use in its case-in-chief.  Rule 16 of the Federal Rules of Criminal Procedure provides:

**Expert witnesses.** -- At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial.  If the government requests discovery under subdivision (b)(1)(C)(ii) and the defendant complies, the government must, at the defendant's request, give to the defendant a written summary of testimony that the government

intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as
evidence at trial on the issue of the defendant's mental condition.  The summary
provided under this subparagraph must describe the witness's opinions, the bases and
reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G).  Rule 16 similarly provides that a defendant must produce a summary

of expert testimony under some circumstances:

> **Expert witnesses.** -- The defendant must, at the government's request, give to the
> government a written summary of any testimony that the defendant intends to use
> under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial,
> if--
>
>> (i) the defendant requests disclosure under subdivision (a)(1)(G) and the
>> government complies; or
>>
>> (ii) the defendant has given notice under Rule 12.2(b) of an intent to present
>> expert testimony on the defendant's mental condition.
>
> This summary must describe the witness's opinions, the bases and reasons for those
> opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(b)(1)(C).

An untested hypothesis does not provide a scientific basis to support an expert opinion.  See
Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue
disease is an untested hypothesis.  At worst, the link has been tested and found to be untenable.
Therefore, there is no scientific basis for any expert testimony as to its specific presence in
Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d at 1228 ("An untested hypothesis cannot be
a scientifically reliable basis for an opinion on causation.").  A court is not required "to admit
opinion evidence that is connected to existing data only by the ipse dixit of the expert.  The court
may conclude that there is simply too great an analytical gap between the data and the opinion
proffered."  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).  See Hollander v. Sandoz Pharm.
Corp., 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of similarity between animal studies and

human studies, including dose and route administration); <u>Tyler v. Sterling Drug., Inc.</u>, 19 F.Supp.2d 1239, 1244 (N.D. Okla. 1998)("Test results on animals not necessarily reliable evidence of the same reaction in humans.").  Courts have excluded experts' opinions when the experts depart from their own established standards.  <u>See</u> <u>Truck Ins. Exch. v. Magnetek, Inc.</u>, 360 F.3d at 1213 ("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); <u>Magdaleno v. Burlington N. R.R. Co.</u>, 5 F. Supp. 2d 899, 905 (D. Colo. 1998)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

## ANALYSIS

The Court will allow McNutt to testify.  The parties agreed to McNutt testifying without the Court's imprimatur on McNutt as an expert witness.  The Court will not allow the United States to offer him as an expert witness in the jury's presence, the Court will not certify McNutt as an expert witness in the jury's presence, and the jury instructions will not refer to him as an expert.  The issues that the United States and Gutierrez-Castro bring out during McNutt's direct examination and cross examination will go to the weight and credibility of McNutt's testimony.

## I.   McNUTT IS SUFFICIENTLY QUALIFIED TO EXPRESS EXPERT OPINIONS ABOUT THE METHODS AND PRACTICES OF INKED FINGERPRINT ANALYSIS.

Gutierrez-Castro argues that McNutt is not sufficiently qualified to express expert opinions about the methods and practices of inked fingerprint analysis.  Gutierrez-Castro argues that, while McNutt's resume indicates that he is a certified latent fingerprint examiner and that he has completed several classes on fingerprint analysis, a 2009 report from the National Academy of Sciences indicates that certification may not be a valid indication of knowledge or ability. Gutierrez-Castro states that training and certification procedures vary from agency to agency and

that there is no standardized or approved method of certification.  Gutierrez-Castro asserts that, because there are no standardized methods of accreditation or the necessary training to reduce errors, and because McNutt has not taken a class since 2004, he is not qualified to offer expert testimony about fingerprint analysis.

The United States argues that, as a fingerprint analyst, McNutt has undergone demanding training culminating in proficiency examinations, followed by further proficiency examinations at regular intervals during his career.

The Court finds that McNutt is qualified to offer expert testimony about fingerprint analysis. Rule 702 states: "[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702.  In United States v. Vargas, 471 F.3d 255 (1st Cir. 2006), the United States Court of Appeals for the First Circuit stated:

> Liszkiewicz's qualifications as a fingerprint analyst are considerable. Liszkiewicz testified that he has worked in the field of fingerprint analysis for over twenty years. He has completed two FBI courses in fingerprint comparison, as well as other training courses. He is a certified fingerprint examiner and police instructor. He has been deemed qualified as a fingerprint expert in over one-hundred previous cases. Moreover, there is no evidence that an understanding of statistical studies on the significance of recurring fingerprint characteristics is required by any standard of fingerprint identification analysis.
>
> It is not required that experts be "blue-ribbon practitioners" with optimal qualifications. United States v. Mahone, 453 F.3d 68, 71 (1st Cir.2006). Given the evidence of Liszkiewicz's training, experience, and skill, the district court did not abuse its discretion in finding him sufficiently qualified to testify as an expert on fingerprint comparison, as that ruling fell within the broad purview of the trial court's discretion.

471 F.3d at 262.

McNutt has fifteen years experience as a fingerprint expert.  See Curriculum Vitae of James C. McNutt at 1, filed July 26, 2011 (Doc. 56-1)("McNutt's CV").  He is certified by the IAI as a

Latent Print Examiner and as a Senior Crime Scene Analyst.  See McNutt's CV at 1.  McNutt was first certified in 2001.  See Aug. 11, 2011 Tr. at 132:11-12 (Sapien, McNutt).  IAI requires re-certification every five years.  See Aug. 11, 2011 Tr. at 132:18-20 (Sapien, McNutt).  McNutt was certified in 2006 and was last certified in 2011.  See Aug. 11, 2011 Tr. at 132:21-133:1 (Sapien, McNutt).  To be re-certified, the IAI requires a person to accumulate eighty hours of continuing education credits.  See Aug. 11, 2011 Tr. at 133:4-6 (Sapien, McNutt).  McNutt has attended classes on: (i) fingerprint classification in 1992, which the Federal Bureau of Investigation ("FBI") sponsored; (ii) latent print development techniques in 1995, which the FBI sponsored; (iii) latent print identification in 1995, which the FBI sponsored; (iv) advanced palm print identification in 1997; (v) advanced ridgeology comparison techniques in 1999; (vi) administrative advanced latent fingerprint course in 2001, which was at the FBI academy; (vii) digital imaging of evidentiary photography in 2003, which was at the FBI academy; and (viii) basic forensic ridgeology in 2004. See McNutt's CV at 1.  The last course McNutt took was a forty-hour course on basic forensic ridgeology in 2004, but the IAI allows members to obtain hours by attending conferences, going to workshops, doing casework, or teaching.  See Aug. 11, 2011 Tr. at 133:9-134:10 (Sapien, McNutt). McNutt has accumulated approximately one-hundred-and-twenty hours by attending conferences and workshops, doing casework, and teaching, but did not have space to list all these activities on his resume.  See Aug. 11, 2011 Tr. at 134:8-10 (McNutt).  Given McNutt's experience and training, the Court finds that he is sufficiently qualified to express an expert opinion about the methods and practices of inked fingerprint analysis.  See Fed. R. Evid. 702 ("[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." ); United States v. Vargas, 471 F.3d at 262.

Gutierrez-Castro does not apparently contend that McNutt is unqualified in his craft.[4] Gutierrez-Castro's problem is with the craft.  Gutierrez-Castro's primary -- if not sole -- contention is that fingerprinting is not a reliable means of identifying people.

## II.   THE COURT FINDS THAT FINGERPRINT ANALYSIS IS SUFFICIENTLY RELIABLE TO BE ADMISSIBLE AND THAT GUTIERREZ-CASTRO CAN CROSS-EXAMINE McNUTT TO EXPOSE ANY WEAKNESSES.

Gutierrez-Castro argues that McNutt's testimony does not reflect specialized knowledge. He argues that, in the case of fingerprint analysis, there have been very few peer reviewed studies and that an error rate has never been established.  He contends that the subjective nature of fingerprint analysis makes it nearly impossible for an expert to determine whether two fingerprints match or even establish an error rate for fingerprint analysis.  Gutierrez-Castro contends that fingerprint analysis is an unreliable process that does not pass the test that Daubert v. Merrell Dow Pharmaceuticals, Inc. sets forth, because there is no uniform procedure for certification or analysis, because the results can vary based on the examiner and quality of the images, and because there is no rate of error on which the Court may rely.

The United States argues that the theories underlying fingerprint identification -- that fingerprints are unique and permanent and that identification matches can be made from fingerprints containing sufficient detail -- are testable and have actually been tested by experience.  It argues fingerprint analysis has been subjected to peer review.  The United States also argues that, although a precise error rate has not been established, various estimates of error rates suggest the error rate is low.  The United States further contends that the procedure McNutt used is a widely accepted

---

[4] Gutierrez-Castro suggested that McNutt has not taken classes since 2004 and therefore could not be re-certified.  McNutt was re-certified in 2011.  See Aug. 11, 2011 Tr. at 133:2-134:10 (Sapien, McNutt).

standard governing operation of the methodology and that the method is generally accepted in the fingerprint analysis community.

Several courts of appeal have found that district courts did not abuse their discretion in admitting the United States' latent fingerprint identification evidence. See United States v. Baines, 573 F.3d 979, 990-91 (10th Cir. 2009); United States v. Mitchell 365 F.3d 215, 246 (3d Cir. 2004)(concluding, on the record before it, that the district court did not abuse its discretion in holding the United States' evidence of latent fingerprint identification admissible, because most of the factors set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc. supported or did not disfavor admitting the evidence, and because there were good grounds for its admission).

In United States v. Baines, the Tenth Circuit addressed whether the district court in the case before it abused its discretion in admitting expert testimony of fingerprint analysis. See 573 F.3d at 989.  The district court held a pretrial hearing on the defendant's motion to exclude fingerprint evidence.  See 573 F.3d at 981. The district court held that the evidence "was shown to be relevant and reliable, meeting the requirements of Fed. R. Evid. 702."  573 F.3d at 985.  The Tenth Circuit stated:

> Although this record raises multiple questions regarding whether fingerprint analysis can be considered truly scientific in an intellectual, abstract sense, nothing in the controlling legal authority we are bound to apply demands such an extremely high degree of intellectual purity. Instead, courts applying Fed.R.Evid. 702, Daubert, and Kumho Tire, are charged only with determining that the expert witness "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152 . . . .

573 F.3d at 989.  Regarding whether the technique can be and has been tested, the Tenth Circuit "seriously consider[ed] defendant's argument that the testing of fingerprint analysis that has been reported mostly falls short of the rigors demanded by the ideals of science."  573 F.3d at 990.  It noted, however, that "[o]n the other hand, the core proposition -- that reliable identifications may

be made from comparison of latent prints with known prints -- is testable."  573 F.3d at 990.  The

Tenth Circuit further noted that "unquestionably the technique has been subject to testing, albeit less

rigorous than a scientific ideal, in the world of criminal investigation, court proceedings, and other

practical applications, such as identification of victims of disasters."  73 F.3d at 990.  The Tenth

Circuit thus stated that although it agreed with the

> defendant that this record does not show that the technique has been subject to
> testing that would meet all of the standards of science, it would be unrealistic in the
> extreme for us to ignore the countervailing evidence.  Fingerprint identification has
> been used extensively by law enforcement agencies all over the world for almost a
> century.  Fingerprint analysts such as Mr. Fullerton, who have been certified by the
> FBI, have undergone demanding training culminating in proficiency examinations,
> followed by further proficiency examinations at regular intervals during their careers.
> Although these proficiency examinations have been criticized on several grounds,
> most notably that they do not accurately represent conditions encountered in the
> field, we see no basis in this record for totally disregarding these proficiency tests.

573 F.3d at 990.  The Tenth Circuit thus concluded that the first factor under Daubert v. Merrell

Dow Pharmaceuticals, Inc. weighed "somewhat" in favor of admissibility, "although not

powerfully."  573 F.3d at 990.

Regarding the second factor under Daubert v. Merrell Dow Pharmaceuticals, Inc. -- whether

the theory or process has been subject to peer review and publication -- the Tenth Circuit stated that

it found "little in the record" to guide its consideration.  573 F.3d at 990.  It noted that the defendant

persuasively argued that the verification stage of the ACE-V process is not the independent peer

review of true science.  See 573 F.3d at 990.  It stated that, although the agent's testimony included

some references to professional publications, the references were too vague to enable it to assess the

nature of the professional dialogue offered.  See 573 F.3d at 990.  The Tenth Circuit thus found that

the United States did not show that this factor favors admissibility.  See 573 F.3d at 990.

Regarding the third factor -- known or potential error rate of the procedure --  the Tenth

Circuit noted that, although "testing has been done in training programs and other environments that are not shown to be accurate facsimiles of the tasks undertaken by fingerprint analysts in actual cases," the "the accumulated data is impressive" and that "[v]ery few mistakes are reported in testing that trainees must complete before progressing to actual casework." 573 F.3d at 990. The Tenth Circuit stated:

> More significantly, Agent Meagher testified to an error rate of one per every 11 million cases, and the defense did not -- either in the evidentiary hearing or in the briefs on appeal -- challenge that testimony. There may have been erroneous identifications that never came to light. Defense attorneys rarely have the resources to hire independent experts for trial, and in the interests of finality our system has created obstacles to post-conviction review. But even allowing for the likelihood that the actual error rate for FBI examiners may be higher than reflected in Mr. Meagher's testimony, the known error rate remains impressively low. We are not aware of any attempt to quantify the maximum error rate that could meet Daubert standards, but surely a rate considerably higher than one per 11 million could still pass the test. We conclude that the evidence of the error rate on this record strongly supported the judge's decision to admit the expert testimony.

573 F.3d at 990-91.

Regarding the fourth factor -- the existence and maintenance of standards controlling the technique's operation -- the Tenth Circuit noted:

> The ACE-V system is a procedural standard but not a substantive one. Critical steps in the process depend on the subjective judgment of the analyst. We hasten to add that subjectivity does not, in itself, preclude a finding of reliability. But in searching this record for evidence of standards that guide and limit the analyst in exercise of these subjective judgments, we find very little.

573 F.3d at 991. Because the Tenth Circuit found that determination of this factor was not "critical" to its decision, it assumed arguendo that the factor did not support admissibility. 573 F.3d at 991.

Regarding the fifth factor -- whether the technique has gained general acceptance in the relevant scientific or expert community -- the Tenth Circuit stated that "while we acknowledge that acceptance by a community of unbiased experts would carry greater weight, we believe that

acceptance by other experts in the field should also be considered.  And when we consider that factor with respect to fingerprint analysis, what we observe is overwhelming acceptance." 573 F.3d at 991.  After considering these factors, the Tenth Circuit concluded that the record supported the district court's finding that fingerprint analysis was sufficiently reliable to be admissible and found that the district court did not abuse its discretion.  See 573 F.3d at 992.

The Court finds that fingerprint analysis is sufficiently reliable to be admissible.  See United States v. Baines, 573 F.3d at 992.  Although the Court did not hold a hearing under Daubert v. Merrell Dow Pharmaceuticals, Inc., because neither party thought such as hearing was necessary, "such a hearing is not specifically required."  Burlington N. & Santa Fe Ry. Co. v. Grant, 505 F.3d 1013, 1031 (10th Cir. 2007)("Generally, the district court performs this function at a Daubert hearing, although such a hearing is not specifically required." (citing Hynes v. Energy West, Inc., 211 F.3d 1193, 1203-04 (10th Cir. 2000)).

The Court finds that the first factor -- whether the technique can be or has been tested -- weighs somewhat in favor of admissibility.  The United States contends that the theories underlying fingerprint identification are testable and have been tested by experience.  As the Tenth Circuit stated in United States v. Baines, "the core proposition -- that reliable identifications may be made from comparison of latent prints with known prints -- is testable" and this "technique has been subject to testing, albeit less rigorous than a scientific ideal, in the world of criminal investigation, court proceedings, and other practical applications." 573 F.3d at 990.  The Tenth Circuit stated that, although this technique has not been subject to testing less rigorous than the scientific ideal, it "has been used extensively by law enforcement agencies all over the world for almost a century."  573 F.3d at 990.  Similarly, McNutt testified that fingerprint analysis is used throughout the country to identify people.  See Aug. 11, 2011 Tr. at 154:23-155:1 (Cairns, McNutt).  He also testified that

-20-

there have been over a hundred years of empirical validation to support fingerprint analysis, although it has not been scientifically established that fingerprints are unique to each individual. See Aug. 11, 2011 Tr. at 137:5-18 (Sapien, McNutt). The Court thus finds that this factor weighs somewhat in favor of admissibility.

The Court finds that the second factor -- whether the theory or process has been subject to peer review and publication -- does not weigh in favor of admissibility. In United States v. Baines, the Tenth Circuit noted that the defendant persuasively argued that the verification of the ACE-V process is not the independent peer review of true science and that the agent's testimony was too vague to enable it to assess the nature of the professional dialogue. Similarly, McNutt acknowledged that a National Academy of Sciences Report calls into question ACE-V methodology. See Aug. 11, 2011 Tr. at 147:20-149:10 (Sapien, McNutt). The Court thus finds that this factor does not weigh in favor of admissibility.

The Court finds that the third factor -- known or potential error rate of the procedure -- weighs in favor of admissibility. McNutt testified that error rates do exist, but it is hard to determine an error rate; he testified, however, that the general consensus is that the error rate is very low. See Aug. 11, 2011 Tr. at 149:19-150:1 (Sapien, McNutt). He stated that there have been approximately thirty documented misidentifications in the last thirty or forty years out of millions of fingerprints. See Aug. 11, 2011 Tr. at 150:3-10 (McNutt). As the Tenth Circuit in United States v. Baines noted, although "testing has been done in training programs and other environments that are not shown to be accurate facsimiles of the tasks undertaken by fingerprint analysts in actual cases," "the accumulated data is impressive," and "[v]ery few mistakes are reported in testing that trainees must complete before progressing to actual casework." 573 F.3d at 990.

The Court finds that the fourth factor -- the existence and maintenance of standards

controlling the technique's operation -- weighs in favor of admissibility.  McNutt stated that ACE-V

is the methodology fingerprint analysts use -- which is an analysis and comparison followed by

verification.  See Aug. 11, 2011 Tr. at 125:20-23 (McNutt).  McNutt testified that a fingerprint

analyst looks the levels of detail in the print, starting with the first level -- which is the basic pattern

of the print, such as whether the print is an arch or whirl -- to determine whether the prints match.

See Aug. 11, 2011 Tr. 126:5-21 (McNutt).  If the patterns are consistent, then the analysis moves

to the second level of detail -- which is what the ridges do, such as whether the ridge is divided in

half.  See Aug. 11, 2011 Tr. at 126:23-127:15 (McNutt).  The analysis then looks for the third level

of detail -- which is the shapes of the ridges.  See Aug. 11, 2011 Tr. at 127:16-22 (McNutt).  The

analyst then moves to the comparison phase, in which he or she compares the prints to determine

whether the prints have the same levels of detail.  See Aug. 11, 2011 Tr. at 128:1-14 (McNutt).  If

there are indications that the ridges and other details in the fingerprints match, then the analyst

moves to the evaluation phase, where he or she determines whether there is enough information in

agreement between the two prints to support a conclusion that the prints came from the same person.

See Aug. 11, 2011 Tr. at 128:1-14 (McNutt).  The Court finds that there are thus standards that guide

and limit the analyst in the exercise of subjective judgments.  Indeed, Gutierrez-Castro does not

contend that McNutt did not apply the generally accepted methods for fingerprint analysis; rather,

his argument is that the generally accepted methods do not, even when applied property, produce

reliable results.  The Court thus finds that this factor weighs in favor of admissibility.

The Court finds that the fifth factor -- whether the technique has gained general acceptance

in the relevant scientific or expert community -- weighs in favor of admissibility.  The United States

contends that the method that McNutt used is generally accepted in the fingerprint analysis

community.  McNutt testified that fingerprint analysis is used throughout the country as a means of

identifying people.  See Aug. 11, 2011 Tr. at 154:23-155:1.  As the Tenth Circuit stated in United States v. Baines, "while we acknowledge that acceptance by a community of unbiased experts would carry greater weight, we believe that acceptance by other experts in the field should also be considered.  And when we consider that factor with respect to fingerprint analysis, what we observe is overwhelming acceptance."  573 F.3d at 991.

After weighing these factors, the Court finds that fingerprint analysis is sufficiently reliable to be admissible.  See United States v. Baines, 573 F.3d at 992.

## III.   THE COURT WILL ALLOW McNUTT TO TESTIFY, BUT THE COURT WILL NOT PUT ITS IMPRIMATUR ON HIM AS AN EXPERT WITNESS.

Gutierrez-Castro argues that McNutt's testimony would carry significant weight with the jury and that the Court should consider this carefully, because it could exclude his testimony altogether under rule 403 of the Federal Rules of Evidence.  Gutierrez-Castro argues that the jury will not need an expert explanation to understand McNutt's anticipated testimony, because it is not overwhelmingly complicated or scientific, and that, as such, the Court should not give the testimony additional credit by allowing McNutt to testify as an expert.

Before the trial started on August 11, 2011, Gutierrez-Castro stated that he did not think that McNutt can be excluded as a witness.  He represented that the issue was whether McNutt would be designated or certified as an expert.  Gutierrez-Castro suggested that the parties conduct their direct and cross examination, and then address whether or not he would be certified as an expert, so that the parties did not have to conduct two examinations, one in front of the Court, and one in front of the jury.  The Court stated:

> THE COURT:  Well, maybe this will solve your concerns.  What I could instruct the United States to do -- and this is not [atypical] for me . . . [.]  I don't do it in every case because it's not everybody's concern but just don't ask the Court to certify.

-23-

MR. CAIRNS:  Right.

THE COURT:  And all that will happen is that when we do the jury instructions for example we don't use the word expert and the Court not put its imprimatur on him as an expert, and so I'll not if they don't offer him we just know he's going to testify, we've just d[ecided] that . . . he will testify and everything will[ ] go to weight and credibility don't offer him up and I don't certif[y] him and I don't say anything.  And there's a jury instruction . . . The Tenth Circuit jury instruction doesn't use the phrase "expert," and so we could all just agree we're not going to use it at all.  And then if you'll look at number 7, jury instruction 7, you know a couple of things we could do here.  It doesn't mention expert[.]  [I]t just talks about opinion testimony which I think is a better of way of talking about these types of witnesses anyway and that's usually what I say.  When somebody says, Your Honor, I would like you to accept so-and-so as an expert I usually say well, will allow Mr. Miller . . . to offer opinion testimony.  That's all I say.  And we could not even do that.  We just go ahead right ahead into your opinions and then on this instruction we could eliminate it, we could they've got the first two sentences.  We could leave it, but those might be ways to address your concern.

MR. SAPIEN:  Well and that was my preference would be that we just proceed with the testimony and not have any.

THE COURT:  Interaction between the Court.

MR. SAPIEN:  Right

[THE COURT:] . . .  is that agreeable to you Mr. Cairns?

[MR. CAIRNS:] yes, Your Honor it is it is.

THE COURT:  So . . . just do a direct examination[,] no interaction with the Court[;] you d[o]nt ask him to be accepted by the Court.  We'll just agree that Mr. Sapien['s] concerns . . . go to weight and . . . not to exclusion of him as an expert

[MR. CAIRNS:] that's [perfectly] acceptable.

Aug. 11, 2011 Tr. at 8:10-19 (Court, Sapien, Cairns).  The parties agreed to eliminate the first two sentences in Instruction No. 7, which specifically identified the two experts and their testimony, and the Court stated that it would eliminate those sentences, so it now only discusses opinion testimony without specifically mentioning McNutt:

In some cases, such as this one, scientific, technical, or other specialized

-24-

knowledge may assist the jury in understanding the evidence or in determining a fact
in issue.  A witness who has knowledge, skill, experience, training or education, may
testify and state an opinion concerning such matters.

You are not required to accept such an opinion.  You should consider opinion
testimony just as you consider other testimony in this trial.  Give opinion testimony
as much weight as you think it deserves, considering the education and experience
of the witness, the soundness of the reasons given for the opinion, and other evidence
in the trial.

Court's Final Jury Instructions (Given), Instruction No. 7, at 9, filed August 11, 2011 (Doc. 84).

Gutierrez-Castro represented that he believed these actions resolved the issue that he had raised

under Daubert v. Merrell Dow Pharmaceuticals, Inc.

The Court will allow McNutt to testify, but it will not put its imprimatur on him as an expert

witness in the jury's presence.  The Court will not allow the United States to offer him as an expert

witness, the Court will not certify McNutt as an expert witness in the jury's presence, and the jury

instructions will not refer to him as an expert.  The issues that the United States and Gutierrez-Castro

bring out during McNutt's direct examination and cross examination will go to the weight and

credibility of McNutt's testimony.

**IT IS ORDERED** that Plaintiff United States of America may call James McNutt, from the

Border Patrol/Forensic Document Laboratory, to testify about the methods and practices of inked

fingerprint analysis, and to compare several examples of fingerprints obtained from Defendant

Salvador De Jesus Gutierrez-Castro, and to testify that all the fingerprints belong to the same person.

The United States may not, however, offer McNutt as an expert witness in the jury's presence, the

Court will not certify McNutt as an expert witness in the jury's presence, and the jury instructions

will not refer to McNutt as an expert witness.  Any issues that the parties bring out in direct or cross

examination will go to the weight and credibility of McNutt's testimony.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
   United States Attorney
Norman Cairns
Shammara Henderson
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Kenneth A. Gleria
Kenneth A. Gleria, Attorney at Law
Albuquerque, New Mexico

-- and --

Phillip G. Sapien
Sapien Law, LLC
Albuquerque, New Mexico

      *Attorneys for the Defendant*